# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA

JENNIFER J. REINOEHL,       )
PLAINTIFF               )
v.                      )

**Case No.**  1:24-cv-01393-SEB-MG

DIEGO MORALES, in his   )
individual and official capacity,   )
DEFENDANT           )

FILED

AUG 1 4 2024

U.S. CLERK'S OFFICE
INDIANAPOLIS, INDIANA

## <u>VERIFIED COMPLAINT</u>

Comes now JENNIFER REINOEHL (herein "Plaintiff" or "Reinoehl"), on behalf of herself, pro se, and brings this Complaint for immediate injunctive and declaratory relief against Diego Morales (collectively herein "Defendant") for supporting Indiana unequal ballot access laws that do not ensure all candidates have a modicum of support and laws that promote candidate confusion and failing to take adequate steps to protect the fundamental right to vote.

## I.    <u>PARTIES TO THE COMPLAINT</u>

### A. The Plaintiff

1.    Jennifer J. Reinoehl resides at 51860 Cheryl Dr., Granger, St. Joseph County, IN, 46530 with phone number: 574-302-6088.

1

**B. The Defendant**

2.       Diego Morales is the Indiana Secretary of State, who does business at 200 W.

Washington St., Room 201, Indianapolis, (Marion County) IN 46204, and is being sued in his

individual and official capacity. As a constitutional officer and a member of the State's executive

department, he is Indiana's chief election official.

## II.    BASIS FOR JURISDICTION AND VENUE

3.       The U.S. District Court for the Southern District of Indiana has subject matter jurisdiction

over this action pursuant to 28 U.S.C. §1331, which provides Federal Courts have jurisdiction

over cases involving a federal question—U.S. Constitutional Rights granted under Article

Reinoehland Amendment 17 of the U.S. Constitution requiring a representative government

elected by the people, and 28 U.S.C. § 1367, and the Court may issue a declaratory judgement

and provide for further relief pursuant to 28 U.S.C. §§ 2201 and 2202.

4.       This action is brought under 42 U.S.C.§1983 to redress a deprivation of rights secured by

the United States Constitution and its 1st and 14th Amendments that was committed by persons in

government employ under the color of state law.

5.       The court has personal jurisdiction because Defendant Diego Morales is situated in and

conducting business in Indianapolis, IN which is located in the Southern District of Indiana.

6.       Venue is proper because under 28 U.S. Code § 1391 Defendant, Diego Morales is located

in the Southern District of Indiana and is subject to the Court's personal jurisdiction with respect

to this action.

7.       An actual and justiciable controversy exists between the parties.

## III.    STATEMENTS OF FACTS

8.       Herein, "ballot access" refers to having a candidate's name pre-printed on the ballot and

to write-in candidate status.

9.     Jennifer Reinoehl is an independent voter who has voted in every election in which she was able since she turned 18 years old.

10.     To the best of her knowledge, she has never voted a straight ticket (i.e. solely for all candidates of a single political party). She has voted for not only Democrats and Republicans, but also for Libertarians, Green Party candidates, Constitution Party Candidates, and other third-party candidates and independents and votes for members of completely different political parties all on the same ballot.

11.     Due to unequal ballot access laws in Indiana, in which she is registered and allowed to vote, she has repeatedly had to write-in the candidate she wishes to vote for in past Presidential elections.

12.     During this current, 2024 Presidential election, as in other previous elections, the candidate of Reinoehl's choice, Robert F. Kennedy, Jr., did not qualify for ballot access through the primary process (which Republicans and Democrats qualify for in the state of Indiana) and was required to get about 39,000 signatures throughout the state to get ballot access.

13.     Unlike previous presidential elections, Jennifer Reinoehl volunteered to help Robert F. Kennedy, Jr. get on the ballot here.

14.     An independent presidential candidate in Indiana had from January 10, 2024 until July 1, 2024 to collect about 39,000 signatures to have his or her name pre-printed on the November 2024 General Election Ballot. However, unlike Democrat and Republican candidates who must only list the presidential candidate's name, independent candidates must list the name and address of their vice-presidential candidate on each petition. Because Robert F. Kennedy, Jr. was unable to find a vice-presidential candidate until March, petitioning in Indiana for him could not

start until after that point.

15.     Jennifer Reinoehl collected about 300 signatures herself by going door-to-door; standing in the rain at meeting points to collect signatures, and sitting at fair booths in weather over 90 degrees Fahrenheit among other things.

16.     Reinoehl trained over 100 volunteers how to petition in Indiana. She informed them that the Supreme Court had said they could petition on public sidewalks running parallel to public streets and in parks. Everywhere else she told them to get permission and if permission was ever revoked at any time, they needed to leave.

17.     Reinoehl was frequently harassed on city sidewalks by government employees while collecting signatures. Some, but not all, examples of this harassment follow.

18.     In Indianapolis, on March 29, 2024, Reinoehl was collecting signatures with some other volunteers on the public sidewalk outside the Gainbridge Fieldhouse, 125 S Pennsylvania St, Indianapolis, IN 46204, a sport stadium owned and operated by the city of Indianapolis. There is a public park (based on the definition of "park" IN Code § 35-31.5-2-258 (2023) and IC 36-10-1-2) next to the Gainbridge Fieldhouse which was open to the public at this time. One of the volunteers wandered into the park to collect signatures. A police officer quickly went after him and told him he could not collect signatures there. The same police officer told Reinoehl the Gainbridge Fieldhouse and the public park next to it were private property.

19.     The next day, March 30, 2024, Reinoehl returned to collect signatures at the same spot. She had looked up who owned the Gainbridge Fieldhouse and discovered it was owned and operated by the City of Indianapolis. This time the manager on duty came out on the sidewalk and told Reinoehl to move to the sidewalk on the other side of the street. Reinoehl informed him that this was a public sidewalk running parallel to a public road and cited *Hague v. C.I.O.,* 307

U.S. 496, 515-16 (1939) that supported her petitioning there. He then called someone. After getting off the phone, he told Reinoehl she could petition there, and then he went over and talked to the same police officer who had harassed her and other volunteers the day before. At no point had she or any other volunteer blocked the entrance to the Gainbridge Fieldhouse nor did she get in front of anyone or block anyone's right to passage into or out of the Gainbridge Fieldhouse nor did she block anyone's passage along the sidewalk. Reinoehl could not find any local ordinance against petitioning on sidewalks or in parks or against petitioning within a certain distance from the Gainbridge Fieldhouse entrance.

20.     Reinoehl was petitioning outside the Mishawaka Library, 209 Lincolnway E, Mishawaka, IN 46544, on May 6, 2024, on a public sidewalk that children were using to skateboard and ride bicycles on (without entering the library) while she was there. At no point had she blocked the library entrance nor did she get in front of anyone or block anyone's right to passage into or out of the library nor did she block anyone's passage along the sidewalk. A librarian came out and told her to leave.

21.     At the time, she was collecting the signature of a Robert F. Kennedy, Jr. supporter. He became upset that the library where he was a patron was denying the right to petition. As a result, the librarian backed down and allowed Reinoehl to continue collecting signatures. Reinoehl received a call from the head librarian the next day or so telling her she could not come back and collect signatures outside the Mishawaka library in the future. Reinoehl could not find any local ordinance against petitioning on sidewalks or against petitioning within a certain distance from library entrances in the city of Mishawaka.

22.     In Lafayette, Indiana, on May 7, 2024, on a public sidewalk outside the downtown branch of the Tippecanoe Public Library, 627 South St, Lafayette, IN 47901, where homeless people

were sleeping, congregating, and selecting free books that had been set out on a rack for anyone to take whether or not they were library patrons, a librarian came out and told Reinoehl to leave. At no point had Reinoehl blocked the library entrance nor did she get in front of anyone or block anyone's right to passage into or out of the library nor did she block anyone's passage along the sidewalk. She did collect a signature from one of the homeless people taking shelter from the rain, who asked her what she was doing and then wanted to sign.

23.     Reinoehl had posted online on several platforms that she would be there collecting signatures, and it was a public sidewalk, therefore when the librarian asked that she collect signatures elsewhere, she requested to talk with a police officer to settle the difference of opinion. After calling the police on Reinoehl, a librarian came out and asked the single homeless person who had remained after the storm to leave because the police were coming, and she did not want the homeless person to get in trouble.

24.     Two Lafayette police officers arrived and informed Reinoehl that this was a "private" city sidewalk, and she was not allowed to petition there. He said he did not care what the Supreme Court had said about her rights, but he would arrest her for trespassing and cited Indiana Code 35-43-2-2. On a video recording she made and he consented to he continued to tell her that he and the librarians were agents of the city of Lafayette, and she was not allowed to collect signatures on any city property in Lafayette, Indiana. After shutting off the video, when it sunk in what he was saying, she questioned if she could go down and collect signatures on the sidewalk in front of the courthouse, she was told that she could, but he would be there in "about five minutes" to remove her. She had to leave immediately, or she was told she would be arrested.

25.     Because she opted to leave, she missed collecting signatures from several people who

later contacted her and told her they had been there but did not find her. These people told Reinoehl that homeless people regularly congregate unopposed in the place where Reinoehl was petitioning. Since she had been prohibited from collecting signatures in the city of Lafayette, she could not and did not return to Lafayette to collect signatures. She also had other volunteers turn in petitions there to the courthouse to prevent further trouble. Reinoehl could not find any local ordinance against petitioning on sidewalks or against petitioning within a certain distance from library entrances in the city of Lafayette. Based on what the police officer told her, Reinoehl is uncertain if she can ever return to Lafayette to petition because she has been warned by an agent of the city that she was trespassing on city property, and the Indiana trespassing law is vague on this subject.

26.     In Bloomington, at the downtown Monroe County Public Library, 303 E Kirkwood Ave, Bloomington, IN 47408, on June 1, 2024, it was a rainy day when Reinoehl was collecting signatures with other volunteers. The front of the library has a large overhang that covers some of the public sidewalk. Many people were walking along this sidewalk and not using the library. Reinoehl and the other volunteers were waiting for people to approach them to sign under the overhang to keep the petitions dry. At no point had she or the other volunteers blocked the library entrance nor did she or the other volunteers get in front of anyone or block anyone's right to passage into or out of the library nor did she or other volunteers block anyone's passage along the sidewalk.

27.     A security guard for the library came out and told them they could not petition there. Reinoehl informed him it was a public sidewalk, and they were not approaching patrons of the library, specifically. They were primarily collecting signatures from people who showed up and wanted to sign. The security guard went back inside the library, but then, Reinoehl decided to

demonstrate how to approach people on the sidewalk (the sidewalk was extremely busy) to the other volunteers. Reinoehl left the overhang, choosing a man carrying bags of food. He said he was in a hurry or he would sign and, proceeded to go into the library. The security guard immediately came out and accused Reinoehl of petitioning library patrons. Reinoehl explained what she had been doing, that she was not under the overhang when she did it, and told the security guard she had no way of knowing a person carrying bags of food was going into a library. The security guard then went inside to call the police.

28.     Instead of calling police, the head librarian came out and told Reinoehl she and the other volunteers could stay there, but they could not stand under the awning or within six feet of the library front because the library "owned" it, and it was private property. Reinoehl asked if this was the county library, and when he agreed, she asked if the county owned the library. He changed the subject by telling her that he was only doing what he had been told to do by the head librarian and pointed to a crack in the sidewalk as a "line" that could not be crossed. He made Reinoehl and her volunteers stand in the rain to collect signatures. Reinoehl could not find any local ordinance against petitioning on sidewalks or against petitioning within a certain distance from library entrances in the city of Bloomington.

29.     On May 10, 2024, while on the sidewalk outside the Lake County Public Library, 1919 W. 81st Ave. Merrillville, IN 46410, Reinoehl and other volunteers were taking shelter under the awning from the rain in between going out on the sidewalk to collect signatures. At no point had she or other volunteers blocked the library entrance nor did she get in front of anyone or block anyone's right to passage into or out of the library nor did she block anyone's passage along the sidewalk. Again, a librarian came out and told her and her volunteers to leave. Reinoehl could not find any local ordinance against petitioning on sidewalks or against petitioning within a

certain distance from library entrances in Lake County.

30.     In addition to the harassment, the shortage of volunteers made it stressful and time-consuming for those volunteering to collect signatures. For almost the entire month of June, Reinoehl spent time on the road manning fair booths around the state with her 8-year old. She only saw her husband for brief periods on Sundays. She personally witnessed people running on Republican and Democrat tickets who wanted to sign the petition because they support Mr. Kennedy, but who were prohibited from signing because their committee heads told them they could not.

31.     Some people supported Robert F. Kennedy, Jr., but refused to sign the petition because it was a public document that told everyone they "desired to be able to vote" for Mr. Kennedy. These fears were not unwarranted. In an act of voter intimidation, the Democratic Party in North Carolina called everyone who signed petitions in North Carolina and tried to get them to revoke their signatures.

32.     Other people wanted Mr. Kennedy on the ballot and felt he had a Constitutional right to be there, but could not sign the petition because Reinoehl pointed out they had to "desire to be able to vote for him," and they did not wish to vote for him at this point, but were keeping him in mind as a second option.

33.     Another group of people were extremely interested in a third option for president because they did not want to vote for former President Donald Trump or current President Joe Biden. They wanted to know more about Mr. Kennedy, but they could not sign because they were not sure whether or not they would "desire to be able to vote" for him.

34.     There was no shortage of people who wanted to sign. The shortage came in finding enough volunteers who were able to collect the signatures and organizing in such a short time.

For this reason, the campaign had to spend hundreds of thousands of dollars on paid petitioners to help collect.

35.     Although noon on July 1 was the final deadline to turn petitions in to the 92 county voter registration offices, Reinoehl and others began turning them in June 13. On that day, Reinoehl and other volunteers dropped off 15,000-20,000 signatures to Marion County Voter Registration. When dropping off petitions, Reinoehl informed the voter registration clerks that more would be coming.

36.     On June 14, 2024, when Reinoehl dropped off a group of petitions to Hendricks County Voter Registration, the clerk indicated she did not know what to do with them and had to look it up. This was not the only county that Reinoehl and others found where no one in the office seemed to know what to do with them.

37.     On June 21, 2024, Rick from Marion County Voter Registration called Reinoehl and left a voicemail for her to call him. When she called back, he stated that they were having problems getting through all the petitions, but reassured her they would do it in time. He wanted to know how many more petitions they were planning on turning in. Reinoehl stated they should expect at least one more round of equal or greater numbers. He expressed concern about having enough staff to sort through them and stated he may have to pull from other places. Reinoehl informed him that they were dropping off signatures all over Indiana to many counties.

38.     During that call, Rick stated that 60% of the signatures were being denied because they were "illegible." This concerned Reinoehl since that was not the case in the rest of the state. She was also worried that they (1) would not get enough signatures because that was a high number to refuse to be able to check; (2) they were deeming them illegible because that helped them get through the signatures faster; and (3) the campaign would not have enough time to challenge

them if they needed the signatures because Marion County was having a difficult time going through them.

39.     On June 26, 2024, Reinoehl and other volunteers sorted through 37,000 petitions in the lobby of the Sheraton City Center. As they are supporting an independent candidate who according to FEC rules could collect no more than $6,600 from any single donor at the time (candidates for the Republican and Democrat parties are allowed to collect $150,000+ from each donor), there was not a headquarters or office anywhere in Indiana. At about 2:00 AM the next day, Reinoehl took off on about a 700 mile journey around the state to deliver stacks of petitions to other volunteers throughout the state so they could then take them to almost all of the 92 voter registration areas over the next couple days and do a trial run of the turn-in process on Monday, July 1, 2024.

40.     On June 27th, a volunteer who had dropped off petitions to the Allen County voter registration office called Reinoehl distressed. A county representative told her that we were turning in too many and that Allen county would not accept any more. Reinoehl called the Secretary of State's office, who told her that the campaign could turn them into any county and that they could turn in as many as they wanted to turn in to whichever counties they wanted. Reinoehl asked the Secretary of State's office to contact Allen county and ensure that when they turned the final round in on July 1, 2024, they would be accepted.

41.     Reinoehl and others continued collecting signatures up until June 30, 2024, and on that same day, Reinoehl went to Indianapolis again, collected packs of petitions, and delivered them overnight to volunteers throughout the state.

42.     On July 1, 2024, a few counties where petitions were collected were unable to be reached before noon. Reinoehl also continued receiving more petitions by mail after this time from

volunteers who could not get them to drop off points in time or take them to the courthouses themselves.

43.     Clerks told Reinoehl by Indiana law they had 10 business days to finish the validation process. From July 1 to July 15 is 10 business days (because of July 4) and the validated petitions must be picked up at the counties and turned in by noon on July 15 to the Secretary of State in one bundle.

44.     On or about July 4, 2024, Reinoehl went to the St. Joseph County Voter Registration to pick up one bundle of validated petitions after they had called her to come get them. The clerks stated they were working overtime and putting all their other jobs on hold so they could validate the signatures in a timely manner. When Reinoehl asked what would have happened if three independent candidates had turned in the same amount of signatures, the clerks responded that there is no way they could have gotten all of them done. St. Joseph County finished validating the last of Robert F. Kennedy, Jr.'s signatures July 10.

45.     Marion County struggled even more with finishing the number of signatures they were given. The campaign was not able to pick them up until Sunday, July 14, 2024. This is less than 24 hours before they were due in the State Voter Registration office, which is located in a different building several blocks away. There was no time to review any of the signatures marked illegible and challenge them.

46.     The Robert F. Kennedy, Jr. campaign turned in about 100,000 signatures to county clerks throughout the state. Of those, only about 43,000 were validated—barely giving us the minimum required. That number of signatures, which the counties were struggling to validate in time, was necessary to meet the minimum.

47.     Reinoehl personally looked through many of the petitions after they had been validated.

A few signatures were denied because the person signing had put the date they signed instead of their birthdate on the petition. Although she was unable to examine Marion County's validated petitions, being illegible was marked on only a few signatures with the thousand or so she was able to examine from other counties throughout the state. A few were not registered at all. The biggest reason voters were not validated was because they had moved at some point and either put an old address (while being registered at the new address) or put the new address before they transferred their registration. In most of the counties Reinoehl was able to review, about 75% of the signatures were validated.

48.     The process for Robert F. Kennedy, Jr. is, unfortunately, not yet finished even though the Secretary of State has granted him ballot access. The Democrats and Republicans now have until the end of August to challenge his ballot access and drag him through another lengthy court process.

49.     This is the process an independent candidate had to follow. Jill Stein was also collecting signatures in Indiana, my volunteers reported running into her petitioners, I ran into one of her volunteers dropping petitions off to the Porter County Voter Registration, and Allen county mentioned that her campaign had not brought as many signatures as us. Her campaign did not get enough validated signatures to get on the ballot.

50.     In REINOEHL v. MERRILL, 1:22-cv-01974 (2022), this Court dismissed the case on grounds that the above process (which Reinoehl herself was unaware of and unable to inform the court about at that time—unfortunately) was equal to the one below for Democrats and Republicans. However, it did not review the substitution law at that time because Reinoehl was unaware of it and did not challenge it at the time.

51.     In contrast to what an independent candidate has to do to get on the ballot, under Indiana

Code Title 3, Democrats running for President and seeking ballot access, such as Kamala Harris, had to file all petitions of nomination with at least 4,500 signatures with 500 from each of the nine Indiana Congressional districts by noon on January 30, 2024, with the county voter registration offices where the petition signers reside. Kamala Harris failed to meet this deadline and filed no petitions of nomination with any county voter registration office in Indiana for the validation of signatures. Further, Kamala Harris' name was not on any of the petitions filed by the other Democrats who were running for president, including but not limited to the petitions filed by President Joe Biden.

52.     Democrats running for President and seeking ballot access, such as Kamala Harris, had to collect the petitions from the county voter registration offices after they have been validated and file at least 4,500 validated signatures (500 from each Congressional district) by noon on February 9, 2024, with the state election office in Indianapolis along with their declaration of candidacy for a major political party primary nomination. Kamala Harris failed to meet this deadline and filed no petitions of nomination with the state election office. Further, Kamala Harris' name was not on any of the petitions filed by the other Democrats who were running for president, including but not limited to the petitions filed by President Joe Biden.

53.     No later than noon, February 22, 2024, presidential primary candidates, such as Joe Biden, were supposed to file a withdrawal from the primary election. Joe Biden did not file a withdrawal and ran in the Indiana primary election unopposed as a potential Democratic presidential candidate, which he won.

54.     On June 27, 2024, a debate between former President Donald Trump and President Joe Biden took place on the television network CNN. In this debate, it was generally reported that President Joe Biden performed poorly.

55.     No later than noon July 3, 2024, was the deadline for Democrats to fill a vacancy on the general election ballot if *no candidate* was nominated. It was also the deadline for write-in candidates to file their declaration of intent. Joe Biden had not withdrawn from the race by this time, there was no vacancy to fill, and the Democrats did not file paperwork to fill a vacancy for presidential candidate by this deadline. Kamala Harris did not file a declaration of intent to run as a write-in candidate at this time.

56.     It was not until July 21, 2024, after pressure from Democrat donors, that Joe Biden withdrew from the presidential election and subsequently endorsed Kamala Harris as his replacement.

57.     The Democrats rewrote their rules for nominating candidates and instead of nominating a candidate at the Democratic National Convention on August 19, 2024, instead "nominated" her during a "virtual roll call" August 6th, 2024. The state of Ohio had previously informed the Democrats that this would not be an acceptable means of nominating a candidate for ballot access in its state. Like the primary election where only Joe Biden was allowed to run, the Democratic National Convention will only be a false pretense since the candidate has already been chosen through this means that is not mentioned anywhere in Indiana state law.

## IV.   ARGUMENT

58.     Any number of Democrat candidates can run in the presidential primaries in Indiana. In 2020, the Democrats had five candidates who qualified for the primaries. Running multiple candidates in the presidential primaries ensures that if the lead candidate drops out of the race for any reason prior to the Democratic National Convention, he or she can easily be replaced by the runner up. It also ensures the process is "equally burdensome" to that which an independent must follow. (*Jenness*, 1971)

59.     This year, however, the Democrats discouraged anyone else except Joe Biden from running. They refused to hold a debate between any of the candidates who wanted to run. https://www.pbs.org/newshour/politics/robert-f-kennedy-jr-drops-his-democratic-primary-bid-will-run-as-an-independent  By doing this, and by encouraging Joe Biden to withdraw after major party donors disliked his performance in the Presidential debate, they have forfeited their right to ballot access for a presidential candidate.

60.     In *Jenness v. Fortson*, 403 U.S. 431 (1971) the Court stated, "Although the number of candidates in a party primary election for any particular office will, of course, vary from election to election…in the most recent election year, there were 12 candidates for the nomination for the office…Only two of these 12, of course, won their party primaries and had their names printed on the ballot at the general election…The fact is, of course, that…alternative routes are available to getting his name printed on the ballot. He may enter the primary of a political party, or he may circulate nominating petitions either as an independent candidate…We cannot see how Georgia has violated the Equal Protection Clause of the Fourteenth Amendment by making available these two alternative paths, *neither of which can be assumed to be inherently more burdensome than the other*." [emphasis added]

61.     This year, Joe Biden was the only candidate on the Indiana Democrat Primary Ballot and therefore, guaranteed to win. His own ballot access journey was inherently less burdensome than that of Robert F. Kennedy, Jr. and only required collecting 500 signatures in each of the nine congressional districts.

62.     Further, the Indiana substitution laws allow a candidate for the Republican and Democrat parties to forego the entire primary process and automatically receive ballot access simply because they are being "substituted" for another candidate who has withdrawn. This

"substitution" can occur at any time prior to the General Election. This *is* much less burdensome than the process Robert F. Kennedy, Jr. had to go through to get on the ballot in Indiana. It is also less burdensome than the process Joe Biden went through.

63.    The State of Indiana responded to a CNN survey that it would allow Kamala Harris to be substituted on the ballot in the November General Election for Joe Biden even though she has not undergone any part of the primary process. https://www.cnn.com/2024/07/26/politics/harris-ballot-legal-obstacles-48-states/index.html

64.    Without a democratic candidate on the ballot, Indiana will still have the choice of multiple other candidates for president, including the Republican candidate, Donald Trump, the Libertarian candidate, Chase Oliver, the Green Party Candidate (as a write-in), Jill Stein, and independent, Robert F. Kennedy, Jr.

65.    The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution guarantees "equal protection of the laws."

66.    By allowing an overly broad substitution of one candidate with another because of a poor debate performance that triggered pressure from those primarily financing the Democrat party, the state of Indiana allows Republicans and Democrats to place anyone on the ballot without undergoing any burdensome process.

67.    On the contrary, voters who support independent candidates have to go through the difficult and arduous task of collecting almost 100,000 signatures while being harassed by government employees, then turning them into all the 92 counties prior to the deadlines while hoping no other independents have done the same so the verification process can be completed in time for them to collect them and then turn them into the Secretary of State.

68.    As an independent who votes across parties in every election and bases her vote solely on

the candidate's platform and past voting or civic history, Reinoehl and others similarly situated are having their rights violated. If, for example, the Kennedy Campaign had Joe Rogan running for office with Laura Ingram as his vice-president—collecting signatures from January 10, 2024, to March 26, 2024 and then substituted Robert F. Kennedy, Jr. and Nicole Shanahan at that time because Rogan and Ingraham "withdrew," the process of getting Kennedy on the ballot would have been much easier since most people in Indiana are familiar with Rogan and Ingraham and already know who they are.

69.     It is arbitrary and capricious when there are different requirements for Republican and Democrat candidates than what there are for independent candidates.

70.     Allowing substitution of one candidate for any other person, including those who have not undergone the primary process, serves no purpose other than ensuring Republicans and Democrats always get ballot representation. It makes it easier for Republicans and Democrats to change candidates whenever they feel they cannot win against the opposition and place someone new in, who voters know nothing about and who can be promoted in any way since voters will not have enough time before the election to objectively learn about him or her.

71.     Further, replacing an incumbent presidential candidate with the incumbent vice-president can confuse voters. They may believe they are actually voting for the candidate who has withdrawn since that is the candidate currently in the position, since s/he has not resigned from the position, since s/he has run for seven months as the person who is going to be in that position, and since the vice-president was his/her running mate.

72.     The Democrats repeatedly stated they were running Joe Biden for president. They stifled any competition against him in primaries. They did not change this position until wealthy donors threatened to withdraw funding.

73.     It has been argued and upheld that a state "…surely [has] an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot..." (*Jenness*, 1971) but this interest is true of members of the Republican and Democrat parties as well as for other parties and independent candidates.

74.     In this case, the Democrat Party ran one candidate—thereby guaranteeing that specific candidate's nomination and then substituted another candidate for that one. The primary itself was no longer a competition, but simply a false pretense. If the laws require an arduous process for independent candidates, as they do in Indiana, it is important that the Republicans and Democrats candidates are held at a minimum to the primary process the Supreme Court deemed equal to the process independent candidates must go through to obtain ballot access. (Jenness, 1971)

75.     Indiana can determine its own Federal Election ballot access laws, but those laws cannot differ depending on whether the candidate is the member of a "recognized party" (i.e. Republican or Democrat) or not. In this case, Indiana allows substituting candidates only for Republicans and Democrats and does not allow Independents the same option.

## V.     <u>CAUSES OF ACTION</u>

76.     This lawsuit challenges the Indiana laws allowing Republicans and Democrats to "substitute" any candidate for another candidate at any time during the election process and asks the court prevent Kamala Harris from getting ballot access without any burden on her by being substituted for candidate Joe Biden.

## <u>COUNT I: VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT</u>

77.     All preceding paragraphs are incorporated herein.

78.     Defendant gives preferential treatment to Republicans and Democrats by always allowing them to substitute one candidate for another at any time during the election process while prohibiting Independent candidates from doing so.

79.     By allowing any Republican and Democrat candidate to skip the Indiana ballot access pathway, they do not ensure that candidate has obtained a modicum of support.

80.     By allowing Kamala Harris to be inserted for Joe Biden when Joe Biden has officially run as the presidential candidate for 7 months and only 3 months are left when this switch is being made creates voter confusion.

81.     By allowing Republican and Democrat candidates to skip the state ballot access pathway for any candidate at any time constitutes disparate treatment.

82.     This disparate treatment imposes serious burdens on Reinoehl's (and others similarly situated) Constitutional Right to vote for a representational government by requiring her to go through a burdensome process to get her candidate on the ballot while permitting Democrats and Republicans to put anyone on the ballot at any time without going through any Supreme Court approved equal process.

83.     This disparate treatment imposes serious burdens on Reinoehl's (and others similarly situated) First Amendment rights of association by prohibiting her and others like her from replacing their candidate of choice with anyone else simply because the candidate does poorly in a debate, but allowing Democrats and Republicans to replace candidates who withdraw with any candidate, including those like Kamala Harris, who were not running in the primaries and who did not make a show of any support in Indiana.

84.     This disparate treatment imposes serious burdens on Reinoehl's (and others similarly situated) Fourteenth Amendment rights.

85.     Any legitimate interest the Defendant may have in ensuring independent candidates that are pre-printed on the ballots have a "modicum of support" equally applies to ensuring Republican and Democrat candidates have that same "modicum of support."

86.     Any legitimate interest the Defendant may have in ensuring independent candidates that are pre-printed on the ballots do not create voter confusion equally applies to ensuring Republican and Democrat candidates also do not create voter confusion.

87.     Defendant's actions therefore violate the Equal Protection Clause of the Fourteenth Amendment by allowing a substitution at this late in the Election Process of a Democrat candidate who has (1) not gone through the petitioning requirement nor met the petitioning deadlines for Democrat candidates; (2) not gone through the primary process in Indiana or any other state; (3) not been elected at the Democratic National Convention based on the results of those state primaries.

## COUNT II: DECLARATORY JUDGEMENT

88.     All preceding paragraphs are incorporated herein.

89.     Plaintiff is an interested party seeking declaration of her rights under 28 U.S.C. §2201 because unequal ballot access has functioned to deprive Plaintiff of her fundamental rights and caused injuries and damages.

90.     An actual controversy of judiciable nature has arisen and now exists between Reinoehl and the Defendant concerning their respective rights and legal obligations under the Constitution.

91.     There is no adequate remedy, other than that requested herein, by which this controversy may be resolved.

92.     A declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights, status, legal relations, and duties and act accordingly.

93.     The Court should make declarations about Defendant's obligations under the Constitution, including but not limited to the following:

      a.  Established Parties, such as the Republican and Democrat Party, cannot be exempted from ballot access laws that independent candidates are subject to and obtain ballot access by "substituting" one candidate for another candidate

      b.  Defendant must not allow Kamala Harris on the November General Election Ballot because she has not gone through the primary process in Indiana and the process she has gone through is much less burdensome than the one Robert F. Kennedy, Jr. had to follow.

94.     Reinoehl is entitled to a declaratory judgment against Defendant.

95.     In addition to the declaratory judgments sought herein, Plaintiff seeks further necessary or proper prospective relief as justice may require.

## COUNT III: REQUEST FOR INJUNCTIVE RELIEF

96.     All preceding paragraphs are incorporated herein.

97.     Absent injunctive relief, Reinoehl others similarly situated will suffer irreparable harm in that they will have to continue to undergo burdensome processes to get specific candidates on the ballot while Democrats and Republicans can simply substitute others in as desired without having them go through any burdensome process.

98.     Legal remedies are inadequate to address the states' continuing violation of the U.S. Constitution.

99.     Reinoehl is likely to prevail on the merits because Defendant's conduct contravenes the U.S. Constitution, the 1st and 14th Amendments and it is in the public's interests to ensure protection of rights under the Equal Protection Clause of the United States Constitution.

100.    The balance of interests weighs strongly in favor of equal ballot access for all candidates. Granting injunctive relief would cause no harm to the state, which would be required to do nothing more than to fulfill its statutory duty by ensuring **all** candidates have a modicum of support and must adhere to some burdensome process before giving them ballot access.

101.    Reinoehl is entitled to injunctive relief.

## VI.    PRAYER FOR RELIEF

**WHEREFORE**, Reinoehl respectfully requests that this Court enter judgment against Defendant jointly and severally as follows:

A. Declare that Defendant's actions as set forth herein were in violation of the U.S. Constitution and deprived Plaintiff of her rights, immunities, and privileges afforded thereunder;

B. Declare that the U.S. Constitution preempts any state law, rule, regulation, or policy that state officials rely on for exempting certain political parties from following the ballot access procedures, in this case petitioning, primaries, and election by convention.

C. Declare that allowing the Democrats to substitute any candidate for another candidate at any time is a violation of the Equal Protection Clause of the United States Constitution;

D. Permanently enjoin Defendant from allowing any political party to be pre-printed on the ballot unless the candidate for that party has followed all the burdensome requirements state law requires for ballot access;

E. Strike down Indiana State laws that allow the substitution of one candidate for another;

F. Prohibit Kamala Harris, and/or any other candidate who has not run in the primaries, from obtaining ballot access in the 2024 election;

F. Award Plaintiff her actual costs, damages, expenses, and reparations incurred in pursuing this action as authorized by 42 U.S.C. § 1988 and other applicable provisions; and

G. Grant any and all other and further relief as the Court deems just and proper.

Respectfully submitted this 13th day of August, 2024,

**Jennifer Reinoehl**
Pro se Litigant

**Jennifer Reinoehl**
51860 Cheryl Dr.
Granger, IN, 46530
574-302-6088
E-Mail: commercialsonly@juno.com
Pro se Litigant

## **Verification.**

I, the undersigned, hereby swear or affirm, under penalties of perjury that the foregoing

statements are true.

**Dated August 13, 2024**

Respectfully submitted,

**Jennifer Reinoehl,** Pro se Litigant
51860 Cheryl Dr.
Granger, IN, 46530
574-302-6088
E-Mail: commercialsonly@juno.com